UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EDWARD WILLIAMS,<br><br>                      Plaintiff,<br><br>    v.<br><br>THE CITY OF BELLEVUE, a municipal corporation,<br><br>                      Defendant. | No. 2:16-cv-01034-RAJ<br><br>ORDER |

This matter comes before the Court on Defendant City of Bellevue's ("City" or "Defendant") Motion for Summary Judgment Dismissal of Plaintiff's Claims. Dkt. # 26.[1] Plaintiff opposes the Motion. Dkt. # 43. For the reasons stated below,

---

[1] The Court strongly disfavors footnoted legal citations. Footnoted citations serve as an end-run around page limits and formatting requirements dictated by the Local Rules. *See* Local Rules W.D. Wash. LCR 7(e). Moreover, several courts have observed that "citations are highly relevant in a legal brief" and including them in footnotes "makes brief-reading difficult." *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2014 WL 289924, at *1 (D. Ariz. Jan. 24, 2014). The Court strongly discourages the parties from footnoting their legal citations in any future submissions. *See Kano v. Nat'l Consumer Co-op Bank*, 22 F.3d 899-900 (9th Cir. 1994).

In addition, the way in which the parties decided to cite and provide exhibits was not easily accessible. On many occasions, the parties referenced the record ("COB XXXXX") but did not provide an easy guide to these pages. The Court would have been satisfied had the declarations identified which exhibits corresponded to which COB pages. For example, in Plaintiff's Opposition, he tells the Court that there was documentation on his progress and directs the Court to review COB 11772, COB 11811, and COB 1753. The Court, on its own, eventually found that these corresponded to Exhibits R, S, and T attached to Jason Rittereiser's Declaration. The Court wasted time and resources scouring the record for the evidence. *See United States v. Wong*, No. CR-12-0483 EMC, 2014 WL 923347, at *13 n.5 (N.D. Cal. Mar. 5, 2014), *aff'd*, 603 F. App'x 639 (9th Cir. 2015). It would have been easy and prudent for Plaintiff to add the COB identifiers to paragraphs 19-21 of the declaration. In the alternative, Plaintiff could have cited the declaration and exhibits in his brief. He chose neither option. The Court encourages the parties to be mindful of how they cite the record such that identifying key evidence is smooth and efficient for the Court.

ORDER - 1

the Court GRANTS the Motion.

## I. BACKGROUND

A. <u>Plaintiff's Performance at Bellevue Police Department</u>

Plaintiff, an African American man, lateralled to the Bellevue Police Department (BPD) from the Georgia Sheriff's Department. Dkt. # 1 (Complaint) at ¶¶ 1.1, 4.1-4.4, 4.6. BPD required Plaintiff to complete a twelve-month probationary period, pass the field training program ("FTO program"), and graduate from the lateral police academy. *Id.* at ¶ 4.7; *see also* Dkt. # 27-1 at 7. In the FTO program, officers progress through several rotations and are evaluated on a scale of 1-7 for different performance categories. *See generally* Dkt. # 28-1 at 44-285. Categories include appearance, attitude, knowledge, performance, and relationships. *Id.* Officers are ready to be assigned to a patrol squad once they receive at least a 4 in each category. Dkt. # 44-1 at 64.

Plaintiff began the first rotation of his FTO program in February 2015. Dkt. # 28-1 at 44. Officer Quayle supervised Plaintiff during this rotation. *Id.* Plaintiff consistently received sub-4 marks in the knowledge and performance categories. *Id.* at 44-87. In March 2015, Plaintiff began the second rotation of his FTO program. Dkt. # 28-1 at 88. Officers Bement and Jones supervised Plaintiff during this rotation. *Id.* Plaintiff was still receiving sub-4 marks in several categories. *Id.* at 88-159. On March 25, 2015, Officer Bement completed an end of rotation evaluation for Plaintiff, writing that he did "not recommend that Officer Williams move on to the next phase of his training." *Id.* at 320.

In light of Plaintiff's evaluations in the first two rotations of the FTO program, BPD "unplugged" or "disconnected" him from the program. Dkt. ## 26 at 2, 43 at 4. This allowed Plaintiff to receive six additional weeks of remedial training. *Id.* During this time, officers noted that Plaintiff was "doing very well" but still needed to improve in certain areas "if he wants to meet the minimum acceptable

standard for a solo officer." Dkt. ## 44-1 at 281, 28-1 at 329.

In May 2015, Plaintiff returned to the FTO program for the third rotation. Dkt. # 28-1 at 160. Corporal Burgos oversaw this rotation. *Id.* Plaintiff was still receiving sub-4 marks until May 22, 2015, at which point Plaintiff received an evaluation with nearly all 4's and two 5's. *Id.* at 160-80. On May 31, 2015, Plaintiff began rotation three-and-a-half, supervised by Officer Barnwell. *Id.* at 202. Plaintiff did well at the start of this rotation, earning nearly all 4's in each category. *Id.* Plaintiff's evaluations were consistently strong, with only a few evaluations evidencing sub-4 marks. *Id.* at 202, 205, 210.

On June 17, 2015, Plaintiff entered his final rotation in the FTO program. *Id.* at 225. Officer Perreira evaluated Plaintiff during this phase. *Id.* at 225-69. Plaintiff's scores dropped in both the knowledge and performance categories and continued to be low until the end of the program. *Id.* In early July 2015, Captain Mathieu noted Plaintiff's continuing deficiencies and asked Officer Peacey to work with Plaintiff for two additional weeks. Dkt. # 29-1 at 6, 8. Plaintiff confirmed with Captain Mathieu that he understood the concerns and what he needed to do over the next two weeks with Officer Peacey. *Id.* at 11. Officer Peacey began working with Plaintiff and soon thereafter Plaintiff received 4's in each category. Dkt. # 28-1 at 272-281. However, BPD wanted Plaintiff to show "a sustained consistent ability" to perform his duties adequately. Dkt. # 29 at ¶ 18.

On July 17, 2015, the FTO review board agreed that Plaintiff was "ready for assignment to a patrol squad for the remainder of his probation." Dkt. # 29-1 at 13. The new assignment did not mean that Plaintiff had graduated to full status as a police officer; he was "still supposed to be very closely monitored by the Corporals and Sergeants on their squad." Dkt. # 29 at ¶ 14. Per the assignment, Plaintiff joined Lt. Buck's squad. *Id.* at ¶ 15. Lt. Buck's first monthly evaluation regarding Plaintiff was due at the end of August. *Id.* at ¶ 16. The evaluation reiterated

ORDER - 3

concerns that Plaintiff was performing inadequately in several categories. Dkt. # 29-1 at 24-36. On September 9, 2015, Lt. Popochock sent a memo to Captain Mathieu outlining Plaintiff's continued deficiencies and recommending that Plaintiff "be removed from the probation program and terminated." *Id.* at 84. Captain Mathieu met with Chief Mylett and several other lieutenants, corporals, and officers who had supervised Plaintiff and discussed Lt. Popochock's memo and the best course of action in light of Plaintiff's continued performance issues. Dkt. ## 29 at ¶ 29, 37 at ¶ 19. After the meeting, Captain Mathieu recommended that Plaintiff be terminated. *Id.* at ¶ 30. Chief Mylett terminated Plaintiff's employment effective September 15, 2015. Dkt. # 37-1 at 414-15.

B. Officer Kevin Quayle's Racist Text Message

In May 2015, Officer Quayle was on medical leave for a broken leg when his ex-girlfriend came to the BPD with allegations of misconduct. Dkt. # 26 at 7. Based on the allegations, BPD began a Formal Standards Investigation into Quayle's conduct. *See generally* Dkt. # 44-1 at 167-239. During the investigation, Quayle's ex-girlfriend produced several offensive text message exchanges, including one in which Quayle wrote that if he "didn't have the chocolate face I would bang in sick[.]" *Id.* at 189. Quayle was referring to Plaintiff.

On August 18, 2015, Lt. Ingram brought the racist message to Plaintiff's attention. Dkt. # 44-1 at 163. Lt. Ingram asked Plaintiff if the text was racist or discriminatory, to which Plaintiff responded "Yes." *Id.* Lt. Ingram asked Plaintiff how he felt about the text, and Plaintiff explained that the text was "a little disturbing," especially in light of the working relationship Plaintiff thought he had with Quayle. *Id.* The next day, Chief Mylett called Plaintiff "because he was concerned about him." Dkt. # 37 at 13. Chief Mylett asked Plaintiff what he thought about the situation, and Plaintiff responded that "it's going to be bad for Bellevue if Quayle went on some type of call and actually shot—did something to a

ORDER - 4

minority, that would look bad for the department." Dkt. # 44-1 at 49. He explained that if "[a]nybody found out about this thing it would make him look worse on the department." *Id.* at 50. Plaintiff "specifically gave [Chief Mylett] the example of the Michael Brown incident that happened in Ferguson, and [Plaintiff] told [Chief Mylett] that with all the shootings that's going on of white officers and minorities, that was troublesome." *Id.* at 52. Chief Mylett agreed with Plaintiff. *Id.* at 50, 52. Less than a month later, Chief Mylett terminated Plaintiff's employment.

Plaintiff claims that Lt. Buck and Quayle were good friends, and therefore Lt. Buck retaliated against Plaintiff by drafting a scathing evaluation that led to his termination. Dkt. ## 43 at 7, 44-1 at 149. The BPD asserts that it fired Quayle for misconduct, and that Plaintiff's comments in response to the investigation were not the basis for Plaintiff's termination. Dkt. # 37-1 at 457 (stating that Quayle's termination was effective January 29, 2016); *see also* Dkt. # 26. The BPD emphasizes that Plaintiff's consistent inconsistencies in performance is what led to his termination.

On September 12, 2017, Plaintiff voluntarily dismissed all claims against Chief Mylett and dismissed his Title VII and harassment claims against the City of Bellevue. Dkt. # 55. Plaintiff also dismissed his claims for punitive damages. *Id.* At issue in this motion are Plaintiff's remaining race discrimination, retaliation, and wrongful termination claims.

**II.     LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for

ORDER - 5

the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255.

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also, White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. V. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

### III. DISCUSSION

A. <u>Race Discrimination in Violation of State and Federal Law</u>

The Court analyzes Plaintiff's state and federal race discrimination claims

under the same burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Surrell v. California Water Service Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) ("Typically, we apply the familiar *McDonnell Douglas* burden shifting framework for Title VII and § 1981 claims. . . . A plaintiff may alternatively proceed by simply producing 'direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer.'") (citations omitted); *Hill v. BCTI Income Fund-I*, 23 P.3d 440, 446 (Wash. 2001) (Washington has adopted the federal protocol in discrimination cases brought under state and common law) [2]; *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir.1991) (elements of a cause of action under § 1983 are the same as those under Title VII).

To satisfy his burden on the race discrimination claims, a plaintiff must establish a prima facie case of racial discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. To do so, he may show that (1) he belonged to a protected class; (2) he was performing his job in a satisfactory manner; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment. *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 818 (9th Cir. 2002); *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123 (9th Cir. 2000). "The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is *minimal* and does not even need to rise to the level of a preponderance of the evidence." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

If a plaintiff successfully establishes a prima facie case for race discrimination, the burden of production shifts to the defendant to show a legitimate,

---

[2] Because Title VII of the Civil Rights Act of 1964 was the model for RCW 49.60, courts turn to decisions interpreting the federal provision when analyzing a claim under the WLAD as persuasive authority. *Xieng v. Peoples Nat. Bank of Washington*, 120 Wash. 2d 512, 518 (1993) (citing *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wash. 2d 675, 678 (1986)).

ORDER - 7

non-discriminatory reason for its action. *McDonnell Douglas Corp.*, 411 U.S. at 802. The burden then shifts back to the plaintiff to show that the defendant's reasons were pre-textual. *Id.* at 804. Despite this burden shifting, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated remains at all times with the plaintiff. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Norris v. City of San Francisco*, 900 F.2d 1326, 1329 (9th Cir. 1990).

To avoid summary judgment, a plaintiff "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (quoting *Wallis*, 26 F.3d at 890). Plaintiffs must produce "specific, substantial evidence of pretext." *Id.* An employee's subjective personal judgments of his competence alone do not raise a genuine issue of material fact. *Bradley*, 104 F.3d at 270 (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir.1986)).

There is no doubt that Plaintiff is a member of a protected class and that he was subject to an adverse employment action. Therefore, to establish a prima facie case, Plaintiff must show he was performing his job satisfactorily and similarly situated employees not in his protected class received more favorable treatment.

*1. Whether Plaintiff was performing his job in a satisfactory manner*

Plaintiff carries only a minimal burden to establish his prima facie case; the burden does not even rise to the level of a preponderance of the evidence. *Aragon*, 292 F.3d at 659. Plaintiff produced evaluations and communications showing that he was progressing and the FTO review board deemed him ready for assignment to a patrol car. *See*, *e.g.*, Dkt. # 44-1 at 274, 276, 281, 326. Moreover, many of his evaluations included marks of "4," which indicated that Plaintiff was at least adequate in several key areas. *See generally* Dkt. 28-1 at 44-285 (collection of daily observation reports); *see also* Dkt. 44-1 at 64 (Lt. Buck explains "that 4 means that the student officer handles themselves in the same manner as a non-probationary

officer[.]").

The Court has grave reservations as to whether Plaintiff met his prima facie standard. Though Plaintiff's cited evaluations evidence that he sometimes performed adequately in certain areas, the evaluations also clearly show that Plaintiff consistently performed inadequately in several other areas. However, case law provides a liberal and minimum threshold requirement for Plaintiff to meet his burden at this stage. For this reason only, the Court finds that Plaintiff met his minimal burden.

> *2. Whether similarly situated employees not in Plaintiff's protected class received more favorable treatment*

Plaintiff argues that he does not need to demonstrate that similarly situated individuals outside his protected class were treated more favorably. Dkt. # 43 at 12, 13. Instead, Plaintiff argues that he may establish the fourth prong of his prima facie case of race discrimination by "producing evidence of other circumstances surrounding the adverse employment action which give rise to an inference of discrimination[.]" Dkt. # 43 at 12 n. 1; *Knight v. Brown*, 797 F. Supp. 2d 1107 (W.D. Wash. 2011).

Courts analyzing disparate treatment claims in different contexts than the one at hand have found that the *McDonnell Douglas* framework was "was never intended to be rigid, mechanized, or ritualistic." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978). In a similar vein, the Ninth Circuit has recognized that a plaintiff "must offer evidence that 'give[s] rise to an inference of unlawful discrimination,' **either** through the framework set forth in *McDonnell Douglas Corp. v. Green* **or** with direct or circumstantial evidence of discriminatory intent." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (citations omitted) (emphasis added).

The only evidence of discriminatory intent that Plaintiff offers is Quayle's

ORDER - 9

text message.[3] However, Quayle was not the decision maker with regard to Plaintiff's termination. Plaintiff does not connect Quayle's discriminatory remarks to his termination, rather Plaintiff alleges that his opposition to those remarks led to a retaliation campaign aimed at removing Plaintiff from the department. *Id.* at 640-41 (The court found that the plaintiff did not show a proper nexus between the discriminatory remarks and the subsequent employment decisions. Because the plaintiff could not show evidence of discriminatory intent, the court found that he needed to proceed under the *McDonnell Douglas* framework to succeed on his prima facie case.). Because Plaintiff has failed to provide evidence under a direct or circumstantial theory or under a theory that similar situated individuals outside his protected class received more favorable treatment, he failed to establish a prima facie case of race discrimination.

### 3. *Legitimate, Nondiscriminatory Reason and Pretext*

The Court finds that Plaintiff failed to meet his burden at the first step of *McDonnell Douglas*; that is, he failed to establish a prima facie case for race discrimination. Nonetheless, the Court will briefly address Defendant's legitimate, nondiscriminatory reasons for terminating Plaintiff, as well as Plaintiff's argument that Defendant's reasons are pre-textual.

Defendant need only articulate "some" legitimate, nondiscriminatory reason for terminating Plaintiff's employment. *McDonnell Douglas Corp.*, 411 U.S. at 802. Defendant's burden at this stage is one of production, not persuasion. *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). Defendant met this burden. Defendant produced daily observation reports and evaluations showing that Plaintiff was not meeting the minimum standards necessary

---

[3] Plaintiff focuses his allegations on Quayle's text message. The Court notes that Quayle evaluated Plaintiff during his first rotation in the FTO program. Subsequent FTO evaluators gave Plaintiff scores that were consistent with Quayle's initial scores. However, Plaintiff does not attribute racist or discriminatory actions to these other officers, and he does not include them in his Complaint or subsequent pleadings. Plaintiff does not allege any other actions that were motivated by racial animus other than Quayle's racist text message.

ORDER - 10

to progress past probation. *See, e.g.*, Dkt. # 28-1 at 44-285 (daily observation reports indicating areas where Plaintiff's performance was subpar), 318-320 (end of rotation evaluation where Officer Bement does "not recommend that [Plaintiff] move on to the next phase of his training.), 334-35 (end of phase evaluation suggesting that Plaintiff has not met the minimum acceptable standard of an officer in the department.). Plaintiff's termination letter is consistent with these evaluations, stating clearly that Chief Mylett was terminating Plaintiff's employment because he "fail[ed] to perform at adequate standards during [his] probationary period." Dkt. # 44-1 at 245. Defendant's stated reason for terminating Plaintiff's employment—Plaintiff's poor performance—is a legitimate, nondiscriminatory reason and therefore Defendant has met its burden under *McDonnell Douglas*.

Plaintiff carries the ultimate burden of persuasion to establish that Defendant's proffered reason for terminating Plaintiff was merely pretext for a decision that was actually based on racial animus. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993) ("The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race was. He retains that 'ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination.'") (citations omitted). Plaintiff's argument that Defendant's proffered reasons for termination were pretext for a decision seeped in racial animus is based on conclusions. He does not present evidence that is "both *specific and substantial* to overcome the legitimate reasons put forth by" Defendant. *Aragon*, 292 F.3d at 659. He summarily argues that Lt. Buck's friendship with Quayle evidences a "motivation to protect Quayle." Dkt. # 43 at 15. He claims that Lt. Buck "began to treat Williams differently. . . and began to draft a manufactured Monthly Probationary Report that led to Williams [sic] termination." *Id.* But

ORDER - 11

Plaintiff does not sufficiently rebut the contemporaneous evaluations that question his training and express concern regarding his ability to progress—all of which lend credence to Lt. Buck's report.

In addition, Plaintiff argues that the "the slew of declarations" submitted in this case is evidence of pretext because it represents "a close-knit organization like the police department." *Id.* at 16. He claims that the declarations "are in direct contradiction to contemporaneous writings that demonstrate Williams was performing well as a police officer." *Id.* But Plaintiff does not argue that officers perjured themselves in their testimony submitted in this case, and he again fails to rebut the contemporaneous evaluations in the record before the Court that are consistent with the testimony.

Even if Plaintiff had successfully proved that Defendant's reason was illegitimate, he still did not meet his burden to show that Defendant terminated him because of his race. At this stage, Plaintiff must do more than merely disprove Defendant's justification; Plaintiff must affirmatively prove that race was at the heart of Defendant's termination decision. *St. Mary's Honor Ctr.*, 509 U.S. at 508-520.

Plaintiff did not carry his burden at the prima facie stage of *McDonnell Douglas*. His burden at the pretext stage is even higher. Accordingly, the Court GRANTS Defendant's motion with regard to Plaintiff's race discrimination claim.

B. Retaliation in Violation of State and Federal Law

The Court analyzes Plaintiff's state and federal retaliation claims under the same framework. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-1066 (9th Cir. 2003) (finding that Washington courts look to federal law when analyzing retaliation claims, and utilizing the three-part burden shifting test described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in a statutorily protected

ORDER - 12

activity, (2) defendants took some adverse employment action against him, and (3) there is a causal connection between the protected activity and the discharge. *Id.* at 1065-1066; *Corville v. Cobarc Servs., Inc.*, 869 P.2d 1103, 1105 (Wash. Ct. App. 1994). If a plaintiff establishes a prima facie case, the evidentiary burden shifts to the employer to produce admissible evidence of a legitimate, nondiscriminatory reason for the discharge. *Stegall*, 350 F.3d at 1066; *Hollenback v. Shriners Hospitals for Children*, 206 P.3d 337, 344 (Wash. Ct. App. 2009). If the employer meets its burden, the presumption is removed and the employee must then establish a genuine issue of material fact as to pretext. *Stegall*, 350 F.3d at 1066; *Hollenback*, 206 P.3d at 344.

### 1. *Plaintiff did not engage in a statutorily protected activity*

Plaintiff claims that he engaged in a protected activity when he responded to Chief Mylett and expressed his concerns that harboring an officer like Quayle could lead to problematic police interactions like those witnessed across the country. Dkt. # 44-1 at 49-51. Plaintiff specifically referenced the police shooting of Michael Brown—an unarmed black man in Ferguson, Missouri—as a potential result of keeping officers like Quayle on the force. *Id.* Chief Mylett agreed with Plaintiff's sentiments. *Id.* at 50. Moreover, the record shows that Defendant undertook an investigation into whether Quayle's racism extended beyond the discriminatory text message at issue. Dkt. # 44-1 at 286.

Though it appears that relevant case law views "protected activity" broadly, it does not offer as broad an interpretation as Plaintiff sets forth in his brief. *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) (finding that anti-retaliation statutes aim to eliminate discrimination in employment and are therefore "entitled to a liberal interpretation."). Courts recognize protected activities as the "filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to

ORDER - 13

'oppose[]' an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)). Courts can infer that an "employer's actions were caused by an employee's engagement in protected activities. . . from [the] 'proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Id.* (citing *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000). But evidence of proximity does not supplant a plaintiff's need to show that a protected activity has occurred. *Id.* at 1196 (noting two instances when the plaintiff complained about the discrimination levied against her for her accent—constituting instances of protected activity—and was subsequently denied employment.); *see also Sias*, 588 F.2d at 695 (the plaintiff engaged in a "protected activity" by writing a letter to complain about hiring practices and job conditions and was subsequently discharged), *Currier v. Northland Services, Inc.*, 332 P.3d 1006, 1012 (Wash. Ct. App. 2014) (plaintiff affirmatively complained about another employee's racist and sexist behavior, which resulted in his termination). Therefore, though case law may offer some leniency, it clearly expects plaintiffs to initiate some activity rather than passively respond to inquiries.

Plaintiff did not independently make complaints to Chief Mylett or anyone else in BPD regarding Quayle's text message. Instead, Plaintiff provided thoughtful responses in connection with the investigation of Quayle. In his brief, Plaintiff states that "reporting" his concerns— in response to questions and a phone call initiated by Chief Mylett—was "problematic." Dkt. # 43 at 17. Though this may be the case, he did not show that reporting his concerns was a "protected activity" as understood under anti-retaliation statutes. Because Plaintiff failed to show that he engaged in a protected activity, the Court need not address the remaining criteria for this claim, which specifically includes Plaintiff's allegations regarding Lt. Buck's behavior.

Even if Plaintiff had engaged in a protected activity when he responded to Chief Mylett's inquires, the substance of his complaint does not support a claim for retaliation. That is, Plaintiff did not protest a discriminatory BPD employment practice that affected either himself or other employees. Instead, Plaintiff expressed serious concerns about how Quayle's actions could affect BPD's public image, or how Quayle could be detrimental to public safety. There is no doubt that Plaintiff acted nobly when he expressed concerns for the general public, but, in the context of this case, statutes and case law do not recognize Plaintiff's courageous activity as a protected one. Accordingly, the Court GRANTS Defendant's motion with regard to the retaliation claim.

C. <u>Wrongful Discharge in Violation of Public Policy</u>

Plaintiff claims that Defendant wrongfully discharged him in violation of public policy. Dkt. # 1 (Complaint) at ¶¶ 8.1-8.2. A claim for wrongful discharge "is a narrow exception to Washington's general rule of employment at will." *Armijo v. Yakima HMA, LLC*, 868 F. Supp. 2d 1129, 1134 (E.D. Wash. 2012).

To bring a claim for wrongful termination in violation of public policy, Plaintiff must allege facts demonstrating four elements:

> (1) the existence of a clear public policy (the clarity element); (2) that discouraging the conduct in which he or she engaged would jeopardize the public policy (the jeopardy element); (3) that the public-policy-linked conduct caused the dismissal (the causation element); and (4) that the defendant has not offered an overriding justification for the dismissal (the absence of justification element).

*Armijo*, 868 F. Supp. 2d at 1134 (quoting *Cudney v. ALSCO, Inc.*, 259 P.3d 244, 246 (Wash. 2011)). "[A] clear public policy exists" if it "is demonstrated in 'a constitutional, statutory, or regulatory provision or scheme.'" *Danny v. Laidlaw Transit Servs., Inc*., 193 P.3d 128, 131 (Wash. 2008); *see also Thompson v. St. Regis Paper Co*., 685 P.2d 1081, 1089 (Wash. 1984) ("Thus, to state a cause of action, the

ORDER - 15

employee must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened."). "[C]ourts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." *Danny*, 193 P.3d at 131 (internal quotation marks omitted). Examples of clear public policy violations are "when an employer terminates an employee as a result of his or her (1) refusal to commit an illegal act, (2) performance of a public duty or obligation, (3) exercise of a legal right or privilege, or (4) in retaliation for reporting employer misconduct." *Armijo*, 868 F. Supp. 2d at 1134.

Plaintiff does not state a public policy rooted in the constitution, a statute, or a regulation that gives rise to his claim. He urges, however, that "Washington has a public interest in police officers being free from racism and discriminatory beliefs." Dkt. # 43 at 18. There is no question that biased policing is an issue plaguing many states across the country, including Washington. But Plaintiff did not connect this broad concept to a judicially or legislatively recognized policy. *Danny*, 193 P.3d at 131 ("To qualify as a public policy for purposes of the wrongful discharge tort, a policy must be 'truly public' and sufficiently clear.") (citations omitted). Therefore, Plaintiff did not carry his burden to prove his wrongful discharge claim.

Plaintiff is unable to carry his burden on this claim even if he did show the existence of a clear public policy because Defendant successfully offered an overriding justification for the dismissal. For the same reasons that Plaintiff failed to carry his burden to show pretext under his race discrimination claim, he failed to rebut Defendant's overriding justification on this claim. Therefore, the Court GRANTS Defendant's motion with regard to the wrongful discharge claim.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment. Dkt. # 26. This Order renders the pending motion for partial

ORDER - 16

summary judgment **MOOT**.  Dkt. # 24.

Dated this 3rd day of October, 2017.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge